# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**PETE'S TOWING CO.**

      Plaintiff,

vs.                                    **Case No.: 8:08-CV-209-T-30EAJ**

**CITY OF TAMPA, FLORIDA, et al.**,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

Before the court are Defendants' **Motion for Summary Judgment and Memorandum of Law** (Dkt. 37), Plaintiff's **Memorandum in Opposition** (Dkt. 55), Defendants' **Motion to Strike and/or Disregard** (Dkt. 60), and Plaintiff's **Response** (Dkt. 63).[1]

Plaintiff Pete's Towing Co. ("Pete's" or "Plaintiff") asserts four claims against Defendants City of Tampa, Florida ("the City"), Police Chief Stephen Hogue ("Chief Hogue"), and Sergeants Michael Kitt ("Sergeant Kitt") and Jose Penichet ("Sergeant Penichet") under 42 U.S.C. § 1983 based upon violations of Plaintiff's constitutional rights under the First, Fifth, and Fourteenth Amendments. Pete's alleges that Defendants unconstitutionally engaged in a campaign of intimidation and harassment in an effort to drive Pete's out of the automotive towing business. Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56, arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

For the reasons set forth below, the undersigned recommends that Defendants' motion to strike (Dkt. 60) be granted in part and denied in part and Defendants' summary judgment motion

---

[1] The District Judge referred Defendants' motions to the undersigned for the issuance of a report and recommendation (Dkt. 58).

(Dkt. 37) be granted.

I.      Defendants' Motion to Strike (Dkt. 60)

Defendants contend that the court should strike portions of Plaintiff's Memorandum in Opposition to Defendants' Summary Judgment Motion (Dkt. 55) and its supporting affidavits.

Plaintiff's Second Amended Complaint alleges acts of harassment by Tampa Police Department ("TPD") officers that occurred between July 2005 and July 2007 (Amend. Compl. ¶¶ 8-14). Plaintiff's response to Defendants' summary judgment motion references these acts plus additional harassment by TPD officers that occurred between January 2008 and January 2009 (see Dkt. 55 at 10-11).[2] Defendants argue that the court should disregard these references and either strike or disregard paragraphs 13 through 15 of the affidavit of Ian McGeehan, Plaintiff's owner, because it references these "new" allegations (Dkt. 60 at 3-4). Also at issue is the affidavit of Alexis Torres, a tow truck driver for Country Wide Wrecker Service whose testimony supports Plaintiff's allegations of harassment in 2008 and 2009 (Dkt. 55, Ex. 2).

The court agrees with Defendants that paragraphs 13 through 15 of McGeehan's affidavit and all of Reyes's affidavit should be stricken. Although Plaintiff claims that the information pertaining to Country Wide Wrecker Service is relevant to the overall campaign of harassment instituted by TPD (Dkt. 63 at 3), Plaintiff did not supplement its discovery to disclose allegations of TPD harassment involving Country Wide Wrecker Service and did not disclose Reyes as a potential witness pursuant to Fed. R. Civ. P. 26. Plaintiff offers no justification for this failure. See

_____

[2] The District Judge denied as untimely Plaintiff's motion to amend its complaint to include these allegations but reminded Plaintiff that facts otherwise relevant and admissible, even if not alleged in its complaint, can be used to support Plaintiff's claims. (Dkt. 64, citing Bell Atlantic v. Twombly, 550 U.S. 544, 563 (2007)).

Cooley v. Great S. Wood Preserving, 138 Fed. App'x 149, 161 (11th Cir. 2005) (per curiam) (unpublished) (affirming strike of affidavit where submitting party never listed affiants as prospective witnesses, evidence was not disclosed during discovery, and party offered no justification for this failure). Thus, Plaintiff's reference to Country Wide Wrecker Service and Reyes should be stricken from the record pursuant to Fed. R. Civ. P. 37(c). See Lawver v. Hillcrest Hospice, Inc., 300 Fed. App'x 768, 770 (11th Cir. 2008) (per curiam) (unpublished) (affirming strike of affidavit where affiant had not been disclosed).

Defendants also argue that the court should strike the portions of McGeehan's affidavit pertaining to Five Star Recovery, a company McGeehan formed with a partner once Plaintiff went out of business. According to Defendants, McGeehan's deposition and affidavit contradict each other (Dkt. 60 at 6).

McGeehan testified at deposition that Five Star Recovery ceased operating in 2008 because McGeehan was trying to sell the company and the deal fell through (Ian McGeehan Dep. 125:16-126:8, Aug. 5, 2008). McGeehan testified that TPD officers treated Five Star Recovery better than Pete's (Id. at 126:9-128:3). However, in his affidavit, McGeehan attests that TPD officers "engaged in a pattern of threatening and harassing behavior toward Five Star Recovery . . ." once they realized McGeehan owned it (McGeehan Aff. ¶ 12). These statements are not so inherently inconsistent that the court should strike the portions of McGeehan's affidavit pertaining to Five Star Recovery. See Lane v. Celotex Corp., 782 F.2d 1526, 1529-30 (11th Cir. 1986) (per curiam). Further, McGeehan could have ceased operating Five Star Recovery because the deal to sell it fell through and also because TPD harassment forced it to shut down.

Defendants' request that the court strike the portions of McGeehan's affidavit pertaining to

Five Star Recovery should be denied.

II.     Factual Background

Pete's is a wrecker and salvage business in the City of Tampa that is owned and operated by

McGeehan and Peter Rockefeller (McGeehan Aff. ¶ 1).  Pete's derived its revenue from towing and

impounding vehicles at the request of TPD as a part of TPD's wrecker rotation system and pursuant

to contracts with private companies such as restaurants and apartment complexes (Id. at ¶ 2).

Plaintiff participated in other police agencies' towing rotations as well and also towed at the request

of the City of Tampa Code Enforcement Division (Id. at ¶ 2, 11).   From 2005 until Pete's was

removed from TPD's rotation system on June 1, 2007, Pete's derived seventy percent of its income

from towing rotations (McGeehan Aff. ¶ 3).  During this time period, Pete's performed more towing

for the City than any other company (Douglas Burns Dep. 28:2-6, Sept. 23, 2008).  Pete's ceased

operating in July 2008 (McGeehan Aff. ¶ 11).

TPD has promulgated the Rotation Wrecker System Administrative Rules and Procedures

("the Rules"); the Rules are administered and enforced by TPD's Communications Bureau,

specifically TPD's Communications Manager (Durkin Aff. ¶ 7).  In April 2007, Guy MacDonald

was TPD's Communications Manager (Id. at ¶ 5).

The Rules prescribe the manner in which the rotation system is to operate.  When TPD

requires a wrecker to tow a vehicle after an accident, a dispatcher within the Communications

Bureau places a call to the first company on the list (Guy MacDonald Dep. 8:8-13, Sept. 26, 2008).

After responding to the call, that company then moves to the end of the rotation (Id.).  There are no

contracts between TPD and the towing companies participating in the rotation system.  At the time

of Plaintiff's removal from the rotation system on June 1, 2007, approximately 29 other companies

were on TPD's wrecker rotation list (Durkin Aff. ¶ 9).

TPD maintains a dispatch record for every call it receives (<u>Id.</u> at ¶ 17). This record captures the caller's name and contact information, the nature of call, the name of the officer dispatched, and the amount of time the officer spent on the call (<u>Id.</u>). Calls are categorized as either disturbance or customer dispute calls (<u>Id.</u> at ¶ 18). When a caller requests an officer to respond, an officer is always dispatched to the scene (<u>Id.</u> at ¶ 14). Due to the nature of the towing business, it is not unusual for TPD to receive disturbance and customer dispute calls regarding a wrecker company.

In 2005, TPD received 67 calls regarding disturbances at Pete's; 52 of these calls were classified as customer disputes (Durkin Aff. ¶ 19). In 2006, TPD received 126 disturbance calls and 110 of those calls were classified as customer disputes (<u>Id.</u> at ¶ 21). An officer was dispatched to each of these calls (<u>Id.</u>). In 2007, TPD received 158 disturbance calls from Pete's Towing; 143 were classified as customer dispute calls (<u>Id.</u> at ¶ 22). An officer was dispatched to each of those calls (<u>Id.</u>). In total, forty-five percent of the calls the dispatch center received involving towed vehicles were regarding Pete's (McDonald Dep. 21:16-21).

By comparison, TPD received one customer dispute call in 2003 about Pete's and 17 customer dispute calls in 2004 (Durkin Aff. ¶ 26).

It is not known what percentage of TPD's or the City's towing Pete's performed (McDonald Dep. 21:22-25, 23:1); it is undisputed that Pete's performed more towing than any other company (Burns Dep. 28:2-6).

From 2005 until June 1, 2007, the towing company that generated the second-most customer dispute calls had 31 calls; TPD officers were dispatched to investigate each of these (Dkt. 37, Ex. I).

The majority of the calls TPD received about Pete's involved customers' allegations that their cars were unlawfully towed, that Pete's fees were too high, or that Pete's refused to release their cars (Kitts Aff. ¶ 16). In some instances, police investigation revealed that cars had been either improperly towed or towed without authorization (see Dkt. 37, Ex. B). In 2006, TPD officers were dispatched to respond to customer dispute calls at Pete's Towing several times a day, often spending hours trying to resolve disputes between Plaintiff and the customer (Kitts Aff. ¶ 15).

On October 10, 2005, Sergeant Penichet was dispatched to investigate a stolen car report by a patron of Barnaby's restaurant on Westshore Boulevard in Tampa (Penichet Aff. ¶ 9).[3] His investigation revealed that the car was not stolen but had been towed by Pete's (Id.). Sergeant Penichet believed that the tow driver had stolen the car because he had towed the car without authorization from anyone at Barnaby's and no towing signs were in the area where the car had been parked (Id. at ¶ 10). Sergeant Penichet questioned the driver but did not arrest him because Penichet's supervisor, Sergeant Moody, who was not on the scene but was in communication with Penichet, told Penichet not to (Id.; see also Penichet Aff., Ex. A (police report of incident)).

On May 9, 2006, one of Pete's drivers towed Sergeant Penichet's personal truck from in front of his residence at Sanctuary Apartments, a complex with which Pete's had a private towing contract (Penichet Aff. ¶ 13). When Sergeant Penichet arrived at Pete's to retrieve his truck, he showed his TPD badge and asked that Pete's Towing release his truck to him at no charge, which it did (Id. at ¶ 14). On June 9, 2006, Sanctuary Apartments cancelled its contract with Pete's (Dkt. 37, Ex. B at 15). At least one other resident of Sanctuary Apartments had complained to the

---

[3] The evidence conflicts regarding whether Pete's towed the car from Barnaby's or from Houlihan's (see McGeehan Aff. ¶ 4; Penichet Aff. ¶ 9). The police report states the towing occurred at Barnaby's and the court accepts this as true (Id., Ex. A).

complex's management staff that Pete's had improperly towed her vehicle (Id. at 13-14).

McGeehan testified that, around the time of this incident, Pete's employees began spotting TPD cars parked outside Plaintiff's premises (McGeehan Aff. ¶ 7). TPD officers would sometimes approach customers as they were walking into Pete's and tell them that the business illegally towed cars (Id.; Julie Helton Dep. 16:1-5, July 28, 2008). It is unclear from the record whether officers parked outside of Pete's encouraged Plaintiff's customers to lodge customer dispute calls with TPD. Sometimes TPD officers would pressure Pete's employees to release vehicles without charge or without proper documentation (McGeehan Aff. ¶ 6; Erica Trowell Dep. 22:4-10, July 8, 2008).

One of Plaintiff's former employees, Erica Trowell ("Trowell"), alleges that TPD Officer Orlando Gudes ("Gudes") (who was dismissed as an individual defendant in this case) harassed her at Pete's and threatened her with arrest, followed her home in his patrol car, pulled her over up to 15 times to perform "attitude checks," and showed up at her house to tell her to find a new job (Trowell Dep. 12:1-8). On one occasion, another TPD officer placed Trowell in handcuffs and detained her in his patrol car, but did not formally arrest her (Id. at 6:9-18).

As a result of this increased police presence, McGeehan filed three complaints with TPD's internal affairs office between 2007 and 2008 (McGeehan Aff. ¶ 8). None of the individual Defendants knew of these complaints before Pete's filed this federal action (Stephen Hogue Dep. 12:16-18, 15:-15, July 15, 2008; Penichet Aff. ¶ 16). In addition, Defendant Kitts was not aware of Plaintiff's complaints regarding Officer Gudes before this federal action (Kitts Aff. ¶ 11).

McGeehan and Rockefeller filed their first Internal Affairs complaint on February 13, 2007, alleging that Sergeant Penichet arrested and then released one of Pete's drivers in connection with the incident at Barnaby's and that Officer Patricia Lastra accused Pete's of illegally towing a scooter

from a downtown parking spot (Dkt. 37, Ex. B). TPD Detective Tom Singleton investigated Pete's Internal Affairs complaint and concluded that there was no officer misconduct (Id.).

On June 1, 2007, Guy MacDonald, TPD's Communications Manager, decided to remove Pete's from TPD's wrecker rotation list because he believed that the number of customer dispute calls involving Pete's reflected poorly on the City and TPD (McDonald Dep. 12:19-25, 24:3-6). MacDonald sent Pete's a letter stating his decision on June 1, 2007 (Dkt. 37, Ex. C). The Rules reserve to the City the right to terminate a wrecker company for cause if the company adversely reflects upon the reputation of TPD or the City (Durkin Aff., Ex. A). MacDonald consulted Chief Hogue and the City attorney prior to making his decision (MacDonald Depo. 13:3-7). Plaintiff continued to do business for the City of Tampa Code Enforcement Division and for the Hillsborough County Sheriff's Office ("HCSO"), although Pete's was removed from HCSO's rotation shortly thereafter (McGeehan Aff. ¶¶ 10-11, Ex. 2).

Around this time there was also negative coverage of Pete's Towing on the local news (Steven Dugger Dep. 33:23-25, July 8, 2008). McGeehan identified twenty-three private companies that eventually cancelled their contracts with Pete's due to this negative media coverage and disparaging remarks TPD officers made to Pete's customers (Dugger Dep. 54:18 - 55:20; McGeehan Aff. ¶ 16).

On June 11, 2007, ten days after Plaintiff was removed from the towing rotation, McGeehan and Rockefeller contacted TPD Internal Affairs to lodge a second complaint. They provided Detective Singleton with a copy of McDonald's letter removing Pete's from the rotation (Dkt. 37, Ex. B at 54). McGeehan and Rockefeller again alleged that TPD, and specifically Sergeant Penichet and Officer Lastra, were harassing their business (Id.).

On September 14, 2007, McGeehan and Rockefeller lodged their third and final complaint with TPD's Internal Affairs Bureau (Id. at 56).  They alleged that on several occasions, Officer Gudes had parked his patrol car outside of Pete's and approached customers in an effort to convince the customers to negotiate to reduce the towing fees (Id.).  McGeehan and Rockefeller also alleged that TPD Officer Bridgmon threatened to arrest one of Plaintiff's drivers.  McGeehan showed Detective Singleton a video of Officer Gudes and another TPD officer talking with customers outside of Pete's (Id. at 57-58).  On that occasion Officer Gudes had been dispatched to Pete's Towing to respond to a customer dispute call, per TPD policy (Id.).

From July 1, 2007 (the month after TPD removed Pete's from the towing rotation), until September 16, 2007, TPD received 29 disturbance calls regarding Pete's and officers were dispatched in response to each call (Id. at 57).

III.    Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that there is no issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the movant has met this burden, the nonmoving party must identify specific facts that raise a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(e)(2).

"A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." Back v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); accord Tipton v. Bergrohr

GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992)).  In considering a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Seroka v. Am. Airlines, Inc., 834 F.Supp. 374, 376 (S.D. Ala. 1993) (citations omitted).  The court must judge all evidence in the light most favorable to the nonmoving party, and all justifiable inferences must be drawn in the nonmoving party's favor. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990) (citations omitted).  However, the evidence must also be viewed within the scope of the evidentiary burden of the respective parties under the substantive law of the case. Id. (citing Anderson, 447 U.S. at 248).  If, under this standard, the evidence can be considered such that a reasonable jury could find for the nonmoving party, summary judgment is inappropriate. Id. (citing Celotex, 477 U.S. at 324).

IV.    Discussion

Plaintiff asserts four counts against Defendants under § 1983 for violations of Plaintiff's First, Fifth, and Fourteenth Amendment rights.  Title 42 U.S.C. § 1983 "imposes liability on any person who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and the laws.'" Biasella v. City of Naples, Fla., No. 2:04-CV-320-FTM-29-DNF, 2005 WL 1925705, at *2 (M.D. Fla. Aug. 11, 2005) (quoting 42 U.S.C. § 1983).  A § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process. Arrington v. Helms, 438 F.3d 1336, 1347-48 (11th Cir. 2006) (citations omitted).  A plaintiff must also establish an affirmative causal connection between the defendants' conduct and the constitutional deprivation. Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1165

(11th Cir. 2005).

A § 1983 suit against a governmental entity may not be premised only on a theory of respondeat superior; the governmental entity must deprive individuals of civil rights pursuant to a governmental policy or custom. Wallace v. City of Tarpon Springs, No. 05-CV-979-T-EAJ, 2007 WL 128836, at *7 (M.D. Fla. Jan. 12, 2007) (citing Mandel v. Doe, 888 F.2d 783, 791 (11th Cir. 1989)). To establish a policy or custom sufficient to impose municipal liability, "'it is generally necessary to show a persistent and widespread practice.'" Id. (quoting Fla. Country Clubs, Inc. v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., 98 F.Supp.2d 1356, 1363 (M.D. Fla. 2000)). A plaintiff must demonstrate that the municipality had "actual or constructive knowledge of the acts complained of; a policy or custom is not demonstrated through random acts or isolated instances." Id. (internal quotation marks and citations omitted).

**A.      Procedural Due Process Claim Against Defendant City**

Count one of Plaintiff's amended complaint alleges that in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendant City "deprived Plaintiff of its liberty interest by subjecting it to accusations of criminal misconduct in an ongoing effort to destroy Plaintiff's business and prevent it from engaging in its lawful business." (Amend. Compl. ¶ 21). Plaintiff brings this count pursuant to 42 U.S.C. § 1983.

Count one claims liability on the part of the City only. Thus, it is not enough for Plaintiff to show that the conduct of individual TPD officers or Chief Hogue violated Plaintiff's Fourteenth Amendment rights. Plaintiff alleges that Defendant City damaged not only its reputation but also forced it to close its doors by making numerous false statements to its customers; Plaintiff states a "stigma-plus" claim against the City (Amend. Compl. ¶ 21). Specifically, Plaintiff alleges that the

City, through Chief Hogue and other officers, formulated a plan to harass, intimidate, and interfere with Plaintiff's business in an effort to force Plaintiff to shut down, thus completely depriving Plaintiff of its ability to conduct an automotive towing business (Dkt. 55 at 11-16).

Defamation by the government, apart from any governmental action, does not constitute a deprivation of liberty or property under the Fourteenth Amendment, and therefore must be accompanied by a constitutionally-recognized injury. See Paul v. Davis, 424 U.S. 693, 711-12 (1976); Cannon v. City of West Palm Beach, 250 F.3d 1299, 1302 (11th Cir. 2001). "This rule, labeled the 'stigma-plus' standard, requires a plaintiff to show that the government official's conduct deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging plaintiff's reputation." Cypress Ins. Co. v. Clark, 144 F.3d 1435, 1437 (11th Cir. 1998) (citations omitted).

A "stigma" exists if a state actor made concrete, false factual representations or assertions regarding a claimant's wrongdoing. See Connelly v. Comptroller of the Currency, 876 F.2d 1209, 1215 (5th Cir. 1989). Further, to establish the "infringement" element of a "stigma-plus" suit, a claimant must establish that the state sought to remove or significantly alter a life, liberty, or property interest recognized by state law. San Jacinto Savings & Loan v. Hale, 928 F.2d 697, 701-02 (5th Cir. 1991) (per curiam).

The Fourteenth Amendment's concept of "liberty" includes "the liberty to follow a trade, profession, or other calling." Pleva v. Norquist, 195 F.3d 905, 915 (7th Cir. 1999) (internal quotation marks and citations omitted). "It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment." Bernard v. United Township High Sch. Dist. No. 30, 5 F.3d 1090, 1092 (7th Cir. 1993) (internal quotation marks and

citations omitted); see Conn v. Gabbert, 526 U.S. 286, 291-92 (1999) (liberty interest violated only when state action completely prohibits "the right to engage in a calling").

None of the evidence Plaintiff cites in its response raises an inference that the police activity in and around Pete's was improper, pervasive, or rose to the level of harassment. See Wallace, 2007 WL 128836, at *9-10 (police activity that included parking a patrol car outside plaintiff's bar, stopping customers going into the bar, and performing "walk-throughs" of the bar, did not rise to level of harassment). Plaintiff contends that TPD patrol cars often parked outside of Pete's in an effort to encourage customer complaints. However, McGeehan testified at deposition to only two occasions he could remember when a police officer was at Pete's Towing without being dispatched there (McGeehan Dep. 83:15-18).[4] Although McGeehan submitted a video to Detective Singleton of Officer Gudes and another unnamed TPD officer talking with a customer outside of Pete's, Officer Gudes was dispatched to Pete's on that occasion in response to a customer dispute call (Dkt. 37, Ex. B). On the other hand, Pete's former employee, Pamela Perez, testified that TPD responded to "about 100" customer dispute calls while she was on duty (Perez Dep. 18:16-17); Trowell testified that during her shifts, TPD officers were dispatched to Pete's to respond to customers' calls "every day" (Trowell Dep. 21:13). Pete's manager, Steven Duggar, described the typical situation in which a TPD officer intervened: "[T]ypically somebody was towed and they didn't like the bill, and so they called the police like always. And the police came like they always did." (Steven Duggar Dep. 16:1-3, July 8, 2008).

_____

[4] McGeehan's affidavit states that "[v]arious officers of the TPD would routinely loiter in front of Pete's Towing's premises, often for more than an hour." (McGeehan Aff. ¶ 7). However, McGeehan does not testify that the officers were there without being dispatched; police records indicate that TPD officers sometimes were called out to Pete's several times a day for hours at a time (see Dkt. 37, Ex. B, E; Kitts Aff. ¶ 15).

In May 2006, two TPD officers handcuffed Plaintiff's employee Trowell when she refused to release a car to a customer (Id. at 6:14-18). Approximately ten times TPD officers told Trowell, Perez, and Julie Helton, another Pete's employee, to release cars for free, and they were each threatened with arrest.[5] There is no specific evidence that TPD's conduct in these events was improper, however. A TPD "General Offense Report" authored by Officer Steven Magnan, for example, states that on May 26, 2006, Officer Magnan responded to Pete's to investigate a customer dispute call (Dkt. 37, Ex G at 4). According to Officer Magnan, Trowell interfered with his investigation when she refused to release a car to the customer because McGeehan had told her not to, and she delayed in contacting McGeehan despite Officer Magnan's request that she call him (Id.). Officer Magnan took Trowell into custody; she was ultimately released without charges (Id.). Defendants submit general offense reports detailing numerous investigations into customer dispute calls at Pete's that uncovered either unauthorized tows or intimidation tactics on the part of Plaintiff's employees (Dkt. 37, Ex. F-H). On one occasion a customer called TPD alleging that when he disputed Pete's charges, McGeehan pulled out a gun and threatened him (Dkt. 37, Ex. F at 8-20). Police officers have a duty to investigate such allegations of criminal behavior.

Perez testified that she felt TPD officers were rude and that they would delay in responding to her calls but would quickly respond to a customer's call to the police (Perez Dep. 13:3-6, 16:17-21). She could cite no particular incident, however. Perez and Trowell testify that TPD officers advised Pete's customers that Pete's steals cars and charges excessive fees. Without citing particular

---

[5]    Perez testified that TPD Officer Deborah Moore threatened her with arrest and told her to find another job (Perez Dep. 13:23-24). She could not provide much detail, however: "[w]ell, she demands me to give a car back and I can't because of the law, and then I would lose my job on that term." (Id. at 13:25-14:7).

incidents, Plaintiff argues that TPD officers threatened to "shut down" Plaintiff's business and attempted to discourage potential applicants from applying for jobs at Pete's. Even if true, verbal threats and harassment are generally not actionable under § 1983. <u>King v. Olmsted County</u>, 117 F.3d 1065, 1067 (8th Cir. 1997). A threat constitutes an actionable constitutional violation only when the threat is so brutal or cruel as to shock the conscience or if the threat exerts coercive pressure on the plaintiff and the plaintiff suffers the deprivation of a constitutional right. <u>Id.</u> at 1067.

Trowell also testified that between May and December 2006, Officer Gudes pulled her over in her car on her way home from work approximately 15 times to perform "attitude checks." He never issued her a ticket and did not place her under arrest during any of these stops. Officer Gudes came to Trowell's house once and advised her to find a new job. An officer also called Trowell's mom and told her that Trowell should find a new job. Emotional injury resulting from verbal harassment is insufficient to constitute an invasion of a liberty interest.[6] Moreover, these isolated incidents directed at Trowell do not rise to the level of a campaign of harassment targeting Pete's. <u>Cf.</u> <u>P.A.B., Inc. v. Stack</u>, 440 F.Supp. 937, 940 (S.D. Fla. 1977) (police visits to eleven adult book stores three to seven times a day with each visit involving at least three officers rose to level of harassment). Viewing the evidence in the light most favorable to Plaintiff, Defendants' summary judgment motion as to count one should be granted.

### B.    Count Two: Procedural Due Process (Property Interest)

---

[6] Plaintiff suggests that Gudes was violating Trowell's right to be free from police harassment and intimidation under the Fourth Amendment; as to this argument, Pete's has no standing. <u>Crosby v. Paulk</u>, 187 F.3d 1339, 1346 n. 10 (11th Cir. 1999) ("[f]reedom from unreasonable searches and seizures . . . is a personal right which cannot be asserted vicariously").

Count two of Plaintiff's amended complaint lists all Defendants and alleges that Defendant City "deprived Plaintiff of its property interest in conducting lawful business by endeavoring to destroy such business without providing Plaintiff any meaningful administrative or other opportunity to challenge and bring such actions to an end . . ." (Amend. Compl. ¶ 22).

For purposes of procedural due process claims, a property interest stems "not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts." Arrington, 438 F.3d at 1348 (citations omitted). "Whether these sources create a property interest must be decided by reference to state law." Id. at 1348 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).

Plaintiff has not shown that its position on the wrecker rotation list is "property" within the meaning of the Fourteenth Amendment. "The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" Econ. Dev. Corp. of Dade County, Inc. v. Stierheim, 782 F.2d 952, 954 (11th Cir. 1986) (per curiam) (quoting Logan v. Zimmerman Brush, 455 U.S. 422, 430 (1982)). State law defines the parameters of a plaintiff's property interest for section 1983 purposes, and "[w]hether state law has created a property interest is a legal question for the court to decide." Morley's Auto Body, Inc. v. Hunter, 70 F.3d 1209, 1212 (11th Cir. 1995) (internal quotation marks and citations omitted). In Morley's Auto Body, Inc., the Eleventh Circuit held that a sheriff's office written policies regarding the maintenance and enforcement of its wrecker rotation were not "rooted in Florida law." The court explained:

> The plaintiffs do not cite, and we have not found, any decision of any Florida court indicating that they had an entitlement to remain on the rotation list. Neither do they cite, nor have we found, any Florida statute, state administrative regulation, or any other source of Florida law that might be construed to provide the asserted entitlement.

<u>Id.</u> at 1214.

In the instant case, the Rules promulgated by TPD list in detail how a wrecking company qualifies for the rotation, the application process, and the operation of the rotation system (Durkin Aff., Ex A). The rules require that wrecker services on the rotation comply with the rules to remain on the list (<u>Id.</u> at IV(A)). There is no evidence that the rules have been codified in a state statute or regulation; these rules do not have the force of state law.

Thus, Plaintiff does not have a property interest in remaining on the rotation and its procedural due process claim premised on the City depriving it of a constitutionally-protected property interest fails. To the extent Pete's alleges through Count Two that the City deprived it of its property interest in maintaining an automotive towing business in Tampa, the analysis in section IV(A), <u>supra</u>, applies and summary judgment should be granted as to Count Two.

### C.    Count Three:  Equal Protection

In count three, Pete's asserts a "class of one" equal protection claim against all Defendants by alleging that it was intentionally treated differently from other similarly situated towing companies and that there was no rational basis for this difference in treatment (Amend. Compl. ¶ 23).

In <u>Engquist v. Oregon Department of Agriculture</u>, 128 S.Ct. 2146, 2156 (2008), the Supreme Court held that "the class-of-one theory of equal protection has no application in the public employment context." Employment decision making is an enterprise that is "often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." <u>Id.</u> at 2154. "To treat employees differently is not to violate the equal protection clause; rather, it is an accepted consequence of 'the broad discretion that typically characterizes the employer-employee

relationship." Id. at 2155.

Relying on Engquist, the Eleventh Circuit declined to extend a "class of one" claim to the government-contractor relationship in Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269 (11th Cir. 2008). In that case, the Georgia Department of Transportation cancelled contracts with Douglas Asphalt and refused to accept its bids for other projects due to poor performance on past projects. Id. at 1272. The company and its owners alleged that the Georgia Department of Transportation singled out the company and treated it differently than all other paving contractors in violation of the equal protection clause. Id. at 1271. The Eleventh Circuit reasoned that the government needs to be free to terminate both employees and contractors for "'poor performance to improve the efficiency, efficacy, and responsiveness of service to the public and to prevent the appearance of corruption.'" Id. at 1274 (quoting Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 674 (1996)). Nor had the plaintiff sufficiently identified a similarly situated comparator. "Douglas must identify an instance in which a similarly situated contractor completed its project without being subject to the same testing procedures." Id. at 1275. Although the plaintiff named a specific comparator, it failed to allege that the comparator was similarly situated "in light of all the factors that would have been objectively reasonable" to government officials. Id.

Thus, to the extent Plaintiff bases its "class of one" equal protection claim on its status as a private contractor with TPD or the City, the claim fails under Engquist and Douglas Asphalt. Plaintiff argues, however, that it asserts its equal protection claim as a private citizen – not a government contractor – whose attempts to conduct a lawful business were thwarted by police harassment (Dkt. 55 at 16). According to Pete's, "[n]o other towing company operating in the City of Tampa has been subjected to the kind of harassment and intimidation alleged above." (Amend.

Cmplt. ¶ 16).

Plaintiff relies on <u>Griffin Industries, Inc. v. Irvin</u>, 496 F.3d 1189 (11th Cir. 2007), a pre-
<u>Engquist</u> and <u>Douglas Asphalt</u> decision recognizing a "class of one" claim by the owner of a chicken
rendering plant in Georgia that allegedly was subjected to more rigorous environmental regulation
than its competitor (Dkt. 55 at 16). In <u>Griffin Industries</u>, the plaintiff claimed that local government
officials were encouraging residents of a nearby town to file odor complaints against Griffin
Industries as part of a widespread conspiracy designed to harass and intimidate plaintiff. <u>Id.</u> at 1194.
The conspiracy allegedly culminated in stricter permitting requirements for Griffin Industries
regarding air quality and wastewater treatment. <u>Id.</u>

The Eleventh Circuit recognized the "multi-dimensional" governmental action involved
"varied decisionmaking criteria applied in a series of discretionary decisions made over an extended
period of time." <u>Id.</u> at 1203. "Accordingly, when dissimilar governmental treatment is not the
product of a one-dimensional decision . . . the 'similarly situated' requirement will be more difficult
to establish." <u>Id.</u> at 1203-04. Thus, "similarly situated entities must be very similar indeed." <u>Id.</u> at
1205 (internal quotation marks and citations omitted).

Plaintiff has not identified any other private towing companies that would serve as similarly
situation comparators; in fact, McGeehan testified that he could not think of any (McGeehan Dep.
114:6-10). Pete's bare allegations that other towing companies were treated differently are not
enough to sustain an equal protection claim. For example, Plaintiff does not cite to a single instance
in which TPD did not dispatch an officer in response to a customer dispute call involving another
towing company.

Between March and May 2007, just before Pete's was removed from TPD's towing rotation,

McGeehan and Rockefeller formed Five Star Recovery (also a towing company) for the purpose of determining whether Pete's was being singled out by the police. "We formulated an alter ego to do the same thing, and I think we advised [Internal Affairs] Detective Singleton that we were doing that, and we would keep him apprised of the results of our test." (Id. at 122:15-18). According to McGeehan, when a police officer was dispatched to Five Star Recovery to respond to a customer dispute call, the officer would be even-handed and not take the customer's side as officers did when responding to calls from Plaintiff's customers (Id. at 127:1-13; McGeehan Aff. ¶ 12).

Although Five Star Recovery had at least one private account within TPD's jurisdiction, there is no evidence that it participated in TPD's towing rotation (McGeehan Dep. 125:1-11). Moreover, Five Star Recovery was not in operation during the relevant time period, and it did not have nearly the same volume of business as Pete's. Thus, Five Star Recovery is not a similarly situated comparator.

The court should grant summary judgment in favor of Defendants on Pete's "class of one" equal protection claim.

### D.    Count Four: First Amendment Retaliation

Plaintiff also claims that its complaints to the Internal Affairs unit were made to expose and to correct official police misconduct directed at Plaintiff and that Defendants retaliated by removing Plaintiff from the City of Tampa towing rotation in violation of the First Amendment to the United States Constitution (Amend. Compl. ¶¶ 24-25).

Two Supreme Court cases, O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996) and Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr, 518 U.S. 668 (1996), govern the analysis of Plaintiff's First Amendment retaliation claim (Dkt. 26 at 19). In

Umbehr, an independent contractor alleged that county commissioners terminated his trash-hauling contract in retaliation for criticism of the county and the board. 518 U.S. at 672. The Supreme Court held that the First Amendment protects an independent contractor "from the termination of at-will government contracts in retaliation for their exercise of the freedom of speech." Id. at 670. Umbehr rejected the position that, because the independent contractor had no property interest in the renewal of the contract, the government could terminate the contract in retaliation for the contractor's exercise of his freedom of political affiliation and participation. Id. at 674.

The balancing test applied in the government employment context under Pickering v. Board of Education of Township High School District 205, Will County, 391 U.S. 563 (1968) and its progeny, "adjusted to weigh the government's interests as contractor rather than as employer," determines the extent of the protection. Umbehr, 518 U.S. at 673; see also O'Hare Truck Serv., 518 U.S. at 720-21 (holding that a city council could not condition a towing service's continued inclusion on a call rotation list on political support of a city council member because the city had a practice of removing companies from the rotation list only for cause).

To establish a claim of retaliation under Pickering, Pete's must show that (1) in complaining to the City and TPD through Internal Affairs, Pete's spoke as a citizen addressing a public concern; (2) Pete's interest in the speech outweighs the City's and TPD's interest in prohibiting the speech; and (3) Pete's speech played a substantial or motivating part in the decision to remove Pete's from the towing rotation. See Umbehr, 518 U.S. at 675-76; Vila v. Padron, 484 F.3d 1334, 1339 (11th Cir. 2007). "If the plaintiff establishes these elements, the burden shifts to the defendant to prove it would have made the same adverse employment decision absent the employee's speech." Padron, 484 F.3d at 1339.

The threshold question is whether evidence supports Plaintiff's claim that it spoke as a citizen addressing a public concern when it lodged three reports with Internal Affairs. Courts look to the "content, form, and context" of the speech to assess whether it is of a public concern. Badia v. City of Miami, 133 F.3d 1443, 1445 (11th Cir. 1998) (per curiam) (internal quotation marks and citations omitted). The fact that information may be of general interest to the public . . . does not alone make it of 'public concern' for First Amendment purposes." Morris v. Crow, 142 F.3d 1379, 1381 (11th Cir. 1998) (per curiam) (citations omitted). "Not only must the speech be related to matters of public interest, but the purpose of the expression must be to present such issues as matters of 'public' concern." Id. at 1382.

Viewed in the light most favorable to Plaintiff, McGeehan and Rockefeller were speaking of matters of public concern when they approached Internal Affairs. "An attempt to disclose alleged corruption within a police department is speech related to a matter of public concern because a core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption." Oladeinde v. City of Birmingham, 230 F.3d 1275, 1292 (11th Cir. 2000) (internal quotation marks and citations omitted); cf. Tindal v. Montgomery County Comm'n, 32 F.3d 1535, 1539-40 (11th Cir. 1994) (holding that speech exposing personally suffered harassment or discrimination in the employment context was made for personal benefit of improving conditions of employment and was not protected).

However, Plaintiff has not produced any evidence of the second prong of the test: whether its interest in the speech outweighs the Defendants' interest in prohibiting the speech. Plaintiff has not even alleged that Defendants' alleged campaign of harassment adversely impacted its ability to lodge Internal Affairs complaints. Plaintiff's three complaints to Internal Affairs were investigated

pursuant to TPD policy (see Dkt. 37, Ex. B). There is no evidence that, as a citizen speaking of a public concern, Plaintiff was somehow restrained from filing Internal Affairs complaints.

Plaintiff also offers no evidence creating a genuine factual dispute that its removal from the towing rotation was motivated by its Internal Affairs complaints. In determining whether protected speech was a substantial or motivating factor for adverse governmental action, courts consider the temporal relationship between the protected speech and the adverse action, whether the asserted reasons for the adverse action were pretextual, whether the state actor ever commented that it took action due to the protected speech, and any other circumstantial evidence of causation including whether the stated reasons for the adverse action vary. See Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1290 n. 18 (11th Cir. 2000).

In this case, Pete's lodged one Internal Affairs complaint prior to its removal from the towing rotation; it is temporally impossible that Pete's subsequent two Internal Affairs complaint in any way motivated the City or TPD to remove Pete's from the towing rotation. There is also no evidence that McDonald made the decision to remove Pete's from the towing rotation due to the first Internal Affairs complaint. McDonald testified that he did not know of the complaint and there is no evidence that he made the decision to remove Pete's from the rotation with input from anyone who did (McDonald Dep. 24:3-11).[7] Dispatch records, police reports, and testimony from individual TPD officers support McDonald's testimony that he decided to remove Pete's from the rotation due to the substantial increase in police activity at the business.

Plaintiff claims that the Pickering test does not apply once the City removed Plaintiff from

---

[7] Although McDonald's decision was approved by Chief Hogue, the Chief testified that he did not know of the complaint (Hogue Dep. 12:16-18).

the rotation because that act terminated any government-contractor relationship the City and Plaintiff may have had (Dkt. 55 at 18). According to Plaintiff, the campaign of harassment executed by TPD continued unabated after Plaintiff was removed. Thus, Plaintiff argues it was a citizen – not a government contractor – reporting TPD's harassment to Internal Affairs.

Plaintiff's amended complaint states only that its act of reporting its complaints to Internal Affairs resulted in the retaliatory action of the City removing Plaintiff from the rotation list (Amend. Compl. ¶ 24-25). Even accepting Plaintiff's argument as true, however, as a citizen, Plaintiff must establish that its speech (reporting to Internal Affairs) was constitutionally protected, that Defendants' retaliatory conduct of continuing to harass it adversely affected Plaintiff, and that there is a causal connection between the retaliatory actions and the adverse effect on speech.

Plaintiff cannot demonstrate a causal connection between TPD's alleged harassment and Pete's inability to continue operating as a profitable towing company. Pete's continued to tow vehicles at the request of the Code Enforcement Division, apparently drawing praise from its customers drawn from this source, and pursuant to private contracts (McGeehan Aff. ¶ 11). Although these private contracts eventually dried up, McGeehan testified that it was the combination of bad media coverage and customer complaints instigated by the police that caused Plaintiff's clients to cancel their towing contracts (McGeehan Dep. 132:12-15; see also Duggen Dep. 33:15-17). The one letter in the record from an apartment complex cancelling its contract with Pete's cited a resident's written complaint that Pete's had towed her car without authorization. Most importantly, police reports generated by TPD officers investigating customer dispute calls at Pete's attest to the fact that the officers were not on the premises arbitrarily but rather to conduct lawful investigations.

Thus, summary judgment in favor of Defendants as to Plaintiff's First Amendment retaliation claim should be granted.

### E. Supervisory Liability of Chief Hogue, Sergeant Kitts, and Sergeant Penichet, and Municipal Liability of City

Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates under the theories of respondeat superior or vicarious liability. Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (citations omitted). "Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted). Similarly, to impose § 1983 liability on a municipality, a plaintiff must show "(1) that her constitutional rights were violated; (2) that the municipality had a policy or custom that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). The court has already addressed municipal liability as to count one.

The court need not address the issues of supervisory or municipal liability because there is no underlying constitutional violation. See Walker v. City of Huntsville, Ala., 310 Fed. App'x 335, 339 (11th Cir. Feb. 6, 2009) (unpublished) (per curiam) (citing Beshers v. Harrison, 495 F.3d 1260, 1264 (11th Cir. 2007)).

### F. Plaintiff's Motion to Reconsider Dismissal of Substantive Due Process Claim

Included within Plaintiff's response to Defendants' summary judgment motion is Plaintiff's request that the court reconsider its order dismissing Plaintiff's substantive due process claim (Dkt. 55 at 22-23). The undersigned declines to reconsider an order entered by the District Judge and

recommends that Plaintiff's request be denied.

V.     Conclusion

For the reasons stated above, the undersigned recommends that Defendants' **Motion for Summary Judgment and Memorandum of Law** (Dkt. 37) be **GRANTED and Defendants' Motion to Strike** (Dkt. 60) be **GRANTED in part and DENIED in part**.

**Date:** July 2, 2009

ELIZABETH A JENKINS
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.  See 28 U.S.C. 636(b)(1).